MEMORANDUM OF DECISION, J.
On September 17, 1997, one and one-half years after Muriel M. was removed from the care of her mother, Cheris M.[2], the Department of Children and Families, hereafter "DCF", filed this petition for termination of her parental rights. Muriel was placed into foster care when she was five, in April of 1996, as a result of a suicide attempt by her mother which the child witnessed when she was home alone with her mother. Had it not been for a call to the police by Cheris's therapist, alert to possible trouble because Muriel answered and then dropped the phone, it is likely that Muriel's mother would have died of a drug overdose. Muriel was adjudicated neglected and was committed to the care and custody of DCF on August 6, 1996. The child's biological father is unknown, although Joseph M., mother's partner and the person identified as the father on the child's birth certificate, was permitted to intervene in the neglect and termination of parental rights petitions for dispositional purposes.
Both Cheris M. and Joseph M. have appeared and have CT Page 6155 court-appointed counsel. Only Joseph attended the six days of trial and vigorously contested the DCF plan for Muriel. Also from the evidence, the court finds that both Cheris and Joseph M. acknowledge that Joseph is not the biological father of the child. Further, the court finds that DCF made reasonable efforts to ascertain the identity of the father and to locate him, to no avail. The court finds that it has jurisdiction in this matter and that there is no pending action affecting the custody of Muriel in any other court.
The allegations against Cheris are that her daughter has previously been adjudicated neglected and that she has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, considering the age and needs of the child, this mother could assume a responsible position in her life. Connecticut General Statutes § 17a-112(c)(3)(B). Further alleged pursuant to § 17a0-112(c)(3)(E) is that the child is under the age of seven and that her mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, considering the age and needs of the child, this mother could assume a responsible position in her life, and that her rights to another child were previously terminated pursuant to a petition filed by DCF. An amended statement of facts was filed by the petitioner on December 12, 1997, which is the adjudicatory date pursuant to the statutes.
A. ADJUDICATION
At the commencement of the trial, Cheris M., through her counsel stipulated that there was sufficient evidence for adjudication by clear and convincing evidence that Cheris had failed to rehabilitate pursuant to both sections of the statutes under which termination was sought. The social study prepared by DCF became an exhibit before the court.[3] The court concludes from the stipulation of the parties and the social study by the clear and convincing evidence that the allegations of the petition have been proven. Cheris M. suffers from a psychiatric disability and drug addiction, which she has been unable to address through the many treatment programs provided to her. She does not claim to be rehabilitated and does not seek reunification with her daughter. The court finds that Muriel M. has previously been adjudicated neglected and that her biological mother, Cheris M. has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a CT Page 6156 reasonable time, considering the age and needs of the child, she could assume a responsible position in her life. Connecticut General Statutes § 17a-112(c)(3)(B). Also the court finds, from the clear and convincing evidence pursuant to §17a-112(c)(3)(E), is that Muriel was under the age of seven and that her mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, she could assume a responsible position in her life, and that her rights to another child were previously terminated pursuant to a petition filed by DCF. The court also took judicial notice of the extensive prior court proceedings involving Cheris M. and her family. The court finds that Cheris's rights to two older children, Joshua and Adam Z., were terminated on November 26, 1990 and on June 6, 1996 respectively.
Cheris herself never appeared on any of the six trial days. As a result of the stipulation, the focus of the trial was on the best interests of Muriel M. and the issues surrounding her placement. The need to separate the evidence in a termination of parental rights case into two phases, the first reviewing only those facts supporting adjudication, and the second only those facts bearing on the appropriate disposition, have been repeated often by our courts. "Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only after the statutory grounds for termination of parental rights have been established by clear and convincing evidence." In re Valerie D., 223 Conn. 492, 511, 613 A.2d 478
(1992). In this case, as Cheris, through her counsel, stipulated to the facts supporting adjudication, only the dispositional issues were contested.
The court heard six days of trial, with testimony from many witnesses, and received many documents in evidence introduced by the parties. The court makes the following factual findings and inferences supported by those findings:
B. FACTS
Muriel is the third child born to Cheris M., who has a long standing history of psychiatric problems exacerbated by drug addiction and drug abuse. Cheris's psychiatric difficulties were documented during her adolescence and involve various diagnoses over time, including bi-polar disorder, emerging personality disorder or dissociative identity disorder, as this condition is CT Page 6157 presently labeled, and post-traumatic stress disorder.[4] Her life has been full of turmoil and the resulting chaotic circumstances have impacted Muriel negatively during the time that she was in her mother's care.
1. Muriel and Cheris M.
At the time of Muriel's birth on March 4, 1991, her mother's relationship with Joseph M.[5] was well established. He was present at her birth and he helped care for her during her early years in the home. Cheris's behavior just prior and in the months after the child's birth was indicative of the turmoil that existed and continued to exist in this family's life. In March, Cheris was arrested on charges of prostitution. In September of 1991, she was arrested in connection with an incident where she crashed into six police cruisers after engaging them in a chase. She was charged with speeding, engaging in pursuit, reckless driving, evading responsibility, driving while intoxicated, reckless endangerment and attempted assault on a police officer with a motor vehicle. Cheris was hospitalized for a psychiatric evaluation at that time with recommendations for participation in a partial hospitalization program, which she did not complete.
The next months and years were characterized by her fitful and marginal attendance at various drug and alcohol treatment programs, from which without exception she was discharged prior to completion. Most often, Cheris failed to abide by the rules of the program and also continued her drug use. The social study[6] catalogues an heroic effort on the part of DCF to provide services to an individual, whose psychiatric difficulties and drug addiction contribute to her chaotic and destructive lifestyle. The one constant throughout these years is that Cheris has attended counseling with Glenna Voytovich, her therapist at Catholic Family Services. But as noted by the court appointed evaluator, Dr. Barbara Berkowitz, in 1993, Cheris is a"seriously disturbed young woman whose life had contained a great deal of physical and psychological abuse. She has a pattern of relating that was unstable and changeable with different moods at different times and on different dates. This was confusing to a child," she noted. Dr. Berkowitz stated that during her last evaluation in March of 1998, she found "no significant amount of change, (Cheris) is still significantly labile and changeable and apt to flair into anger abruptly and suddenly and at other times is sweet and dependent." Her prognosis was poor to guarded at best and Dr. Berkowitz stated that Cheris had "made very, very CT Page 6158 little progress", which was not sufficient for parenting.
Services, initially for preventing the removal of Muriel and then for reunification, were offered for years after it was obvious that Cheris could not consistently demonstrate any improved behavior or any consistent period of sobriety. The services provided from 1995 to the present involve a never-ending series of hospital admissions with referrals to treatment programs, which were never completed.[7] Included are multiple admissions to Manchester Memorial Hospital and its partial hospitalization program, the Institute of Living, Cedarcrest Hospital, admissions of various dual-diagnosis programs, John Dempsey Hospital substance abuse treatment program, and to Help, Inc., a substance abuse program in Waterbury as well as admission to St. Mary's program and early in 1998, admission to Oxford house, a half-way home for substance abuse clients. The last referral to Oxford house lasted less than three weeks, before Cheris was discharged for non-compliance. The court concludes, from the clear and convincing evidence, that DCF made heroic efforts, just in the last three years without reviewing the efforts made since 1988, to provide Cheris M. with reasonable and appropriate services, from which she has never benefited for any length of time.
That Cheris's difficulties have remained unchanged for a long period of time is also evidenced by the DCF involvement with her older children, Joshua and Adam. The memorandum of decision in Joshua's termination trial, In re Joshua Z, November 26, 1990 (Sullivan, J.), decision upheld In Re Joshua Z.,26 Conn. App. 58, 597 A.2d 842 (1991), with differing dates and facts, is a depressingly similar chronicle of the impact of Cheris's problems on her oldest child. In Joshua's case, DCF intervened early in his life when he was an infant. For Adam, the brother that Muriel knows and who was in the household with her and Joseph M., the process took longer. He was removed from the home in 1990, and returned to the home after DCF withdrew its termination petition in September of 1992. In October of 1993, DCF sought temporary custody of both Muriel and Adam, which was granted after a hearing in November of 1993. On January 25, 1994, both Adam and Muriel were adjudicated neglected, but Muriel remained in the home under an order of protective supervision. On June 6, 1996, Cheris's rights to Adam were terminated by consent. Muriel, however, was still home with her mother as the order of protective supervision for her had expired in July of 1994. For a period of not quite two years, DCF was not involved in Muriel's CT Page 6159 life, until her mother's suicide attempt which precipitated the present proceedings in April of 1996. Muriel is the child who has been in the care of her mother the longest of all three children.
The impact of her mother's drug addiction and mental instability on Muriel was profound and its effects are observable today in the child's life. In all likelihood, such effects, although they may diminish over time, will always be with Muriel. Under the circumstances of her early chaotic home life, Muriel became a hyper-vigilant, parentified and overly compliant child, concerned with pleasing the adults around her. "Muriel is a bright and cute little girl", Dr. Berkowitz testified. "She could present as a normal healthy child and had learned to play a role for her parents' enjoyment and reinforcement." In her evaluation report of March 1998, Dr. Berkowitz concluded:
 "This child has been traumatized by the neglectful conditions of her home, as well as witnessing the result of her mother's suicide attempt. She became emotionally constricted and suffered from the necessary role-reversal caused by her mother's psychiatric disability and her father's failure to protect her adequately from these conditions."[8]
 2. Muriel and Joseph M.
Placed at issue in this case by Cheris and Joseph M. is not whether Cheris can parent her daughter, Muriel, but whether it is in the best interest of the child for Joseph M. to do so. Joseph has been present during Muriel's entire life, for her birth, her early years when she was at home, and since the time of her placement in 1996, when he has visited faithfully and diligently when permitted. There is no question that he loves this child and she is, for him, his daughter in the full meaning of the word except for its biological connotation. She, too, is connected to him and enjoys being with him.
But his past record with the child has raised serious concerns about his ability to parent her. The testimony of the DCF worker, Ms. Kolpinski, revealed that Muriel has had nightmares about being in the car at night alone in Hartford and waiting for Joe and her mother to come back. Joe, in his testimony, stated that when he and Cheris were still together and Muriel two or three, that there were at least ten or more times when Cheris would call in the middle of the night from Hartford, where she had gone to continue her drug use. He stated he never knew when this was going to happen as she often got up and left CT Page 6160 after the household was asleep. Since he could not leave Muriel home unattended, he would take Muriel with him in the car, wrapped in a blanket, to unsafe and drug-infested parts of Hartford to locate her mother. He had no idea until the trial that the child had such frightening memories and was chastened by the knowledge.
Joseph also knew, during the time the child was at home under DCF protective supervision from 1994, that she was not to be left alone unsupervised with her mother, because of her mother's continuing drug use and psychiatric difficulties. In those months of protective supervision, he usually, but not always, managed to be there himself, have Muriel in nursery school, except for the time he left home for work and the time the child went to school. Not until the trial was it apparent that this period of time was not supervised by other adults, contrary to the assumptions of DFC and Muriel's guardian-ad-litem.
Despite Joseph's awareness of earlier DCF concerns about the impact of Cheris's drug use on her daughter, he did not take action to protect Muriel. On April 12, 1996, Cheris was brought to St. Francis Hospital with an injury to her skull, which had apparently been made by a gun. The injury was treated and Cheris released. She also reported that Joseph's truck, which she had been using, had been stolen. During the weekend, Joseph testified, Cheris slept a lot and he concluded it was from her drug use. She did not talk to him about her injury or how it had occurred. He knew that she had used cocaine on April 12, 1996. He stated that he did not notice anything out of the ordinary. Joseph, despite the fact that Cheris was still asleep and had been unresponsive during the entire weekend, left for work early Monday morning on April 15, 1996 around 5:30 A.M., without checking to see if Cheris could care for Muriel. Sometime late Sunday on April 14 or early on April 15, 1996, Cheris overdosed on her psychotropic prescription medications. When Cheris did not appear for a scheduled appointment, her therapist called the home, Muriel answered and then dropped the phone. Based on her concerns, the therapist contacted the police and when they arrived, the police found Cheris comatose on the couch and Muriel alone in the home. This was not the first suicide attempt Cheris had made and while Joseph now is abjectly sorry about what happened, his sorrow cannot cancel the tragic and continuing impact of this episode of her mother's drug abuse on Muriel.
These events illustrate some of the demonstrable consequences CT Page 6161 of Joseph's crucial and central problem; his inability to provide for Muriel's emotional and psychological needs. Joseph M.'s inability to understand the effect on Muriel of these events, to anticipate the impact of such occurrences and to empathize with the child, including understanding Muriel's emotions and reactions to her mother's behavior, were noted by Dr. Berkowitz. As Dr. Berkowitz testified, "Joseph M. is often inarticulate, and has not grasped the significant and negative impact on Muriel of her mother's personality disorder." While he understood some specific concrete examples, he does not have an overall picture and and he has, she stated for want of a better term, "a lack of psychological mindedness". In 1996, during the second evaluation of the family, Joseph M. described Muriel as being "just like any normal kid." At the conclusion of that evaluation, Dr. Berkowitz emphasized the seriousness of the potential risk to Muriel of her mother's behavior and his co-dependency. She believed that with therapy, Joseph M. would obtain the strength to confront Cheris and protect Muriel.
A full year later, to the child's therapists and Ms. Kolpinski, Joseph M. appears not to have absorbed the information provided and he continued to maintain that Muriel was fine. His inability to understand the risks to Muriel are summarized in a DCF narrative of April 2, 1997.[9] The narrative chronicles a meeting between Muriel's therapist, Dr. Ritz, Ms. Granata and Joseph M. In the face of Joe's insistence that Muriel was fine, Ms. Kolpinski and the therapists attempted:
 "to explain that he needs to see Muriel has problems communicating and being able to express her emotions. . . . We attempted to give him examples of Muriel's reactions to different situations such as witnessing her mother's suicide attempt last year and Joe stated that she did not talk about it to him and he did not perceive that this event had any effect on her. . . . He went on to state that when Cheris completes her program and comes home he will be the parent to Muriel if Cheris cannot parent her. We attempted to explain that this would have an impact on Muriel emotionally and she would be confused about her mother's role in the home. Joe also told Muriel that when her mother was gone on weekends she went with a friend. He could not perceive that Muriel must have wondered about why her mother was at a friend's instead of home with her. This worker attempted to make the correlation that Muriel must have had some reaction when her mother came home from Hartford in a stupor. Joe interjected that she did not come home in a stupor, she was fine." CT Page 6162
In her 1996 evaluation, Dr. Berkowitz recommended returning custody of Muriel to her psychological father, Joseph M. She also specified the further steps to be taken, in her view, to assist Joe and Cheris to reunify with Muriel. Her opinion was markedly different in March of 1998, the time of her last evaluation. At that time and in her testimony before the court, Dr. Berkowitz recommended termination of Cheris's parental rights and did not believe it to be in Muriel's best interest for Joseph M. to be her primary caretaker. She did not believe that he had made the necessary personal internal changes to parent the child, to protect her from her mother and to be able to provide her with stability and a nurturing home. In particular, he did not possess the emotional and psychological understanding to offer Muriel the support that this special needs child requires.
Much has been made at trial about DCF's failure to point out to Joseph M. in writing or in the expectations set for him that he had an improved chance of securing Muriel's return if he severed his relationship with the child's mother, Cheris. Such clarity would suppose that DCF knew at the outset that Cheris would not rehabilitate, so that reunification between all three was no longer possible. That outcome would have been likely, given the predictive effect of her past behavior, but could not certainly have been assumed. Nonetheless, what is strikingly clear from the testimony, from the fact that Muriel was removed because of her mother's conduct, from his discussions with Dr. Berkowitz and the earlier involvement of the family with DCF, was that Cheris M.'s psychiatric disability and drug use brought constant turmoil and chaos to the family, and in particular to this child. What more did Joseph M. need to know than what he had already experienced? His continued denial of the seriousness of Cheris's psychiatric impairment remain part and parcel of Joseph's inability to provide for the emotional and psychological needs of this child. The fact that he severed his relationship with Cheris during the weekend between the two weeks of trial cannot overcome and negate the overwhelming evidence of that denial.
The court does believe Joseph M.'s testimony that he did not permit any face-to-face contact between Cheris and Muriel during the time of his unsupervised visits with her. He did acknowledge one unauthorized phone conversation and explained the circumstances under which it took place. But his involvement with Cheris must have been apparent to Muriel, who received cards and gifts from her mother through him and who saw evidence of her CT Page 6163 mother's presence, just as Ms. Kolpinski did in 1997 during her one unannounced visit. Given Cheris's involvement with him, her presence in the home shortly before trial, whether permanent or not, her voice on his answering machine and other persuasive indicia of her continued presence in his life, the court does not and cannot credit his statement that he will keep Cheris out of his life, if that is what is required for Muriel.
Joseph, like Cheris, received services from DCF to assist with reunification efforts with Muriel. Those services include parent aide services in 1995, referral to parent education classes and anger management counseling, individual and couples therapy, family therapy with Muriel at the Child Guidance Clinic and an additional referral for parenting education, child development and anger management classes.[10]
Joseph has pointed to his completion of the expectations[11] set for him by DCF as justifying return of Muriel to him. While it is undisputed that he attended individual counseling, is in counseling with Muriel's treatment providers, and attended parenting classes, what is less clear is what insight the therapy has provided. Faithful attendance alone is not the purpose of such referrals, but personal change, growth, and insight into past difficulties. Perhaps there have been some changes, but Dr. Berkowitz concluded they were small changes, if any, and that Joseph M. was not in a position to parent this needy child.
3. Muriel and her foster parents
Muriel was placed with her present foster parents in June of 1996. When she first arrived, her foster mother testified, she was six going on eleven or twelve. She would hold things in and was unable to show affection or emotion. She needed to be taught that it was not her to make breakfast and to clean. Slowly, since her placement, she had learned how to play, to be emotionally responsive and, in short, to be a child. Dr. Berkowitz noted the change in her behavior, finding her less constricted and more open in the presence of her foster parents. She has also been able to say that she enjoys being taken care of in this fashion.
Muriel is a bright and engaging child. She is at the top of her class in school and performing very well academically. She has been able to make friends and has adjusted to her role in her foster family. More recently, she has been teased at school about CT Page 6164 her visibly Asian features and her foster parents have tried to help her deal with her differences. Joe, too, with the help of his therapist, have tried to assist her with her "difference" from other children in her class and her family. While there have been some concerns about the health of her foster parents and their ability to care for Muriel on a long term basis, those concerns have been addressed satisfactorily by physicians' reports. The foster mother testified that she and her husband would like to adopt Muriel, if that were possible.
4. Muriel's Expressed Placement Preferences
After the commencement of testimony and on the fifth day of trial, after the court-appointed guardian-ad-litem testified as to his contacts with Muriel, her statements to him and his interpretation of her statements of preference, counsel for Muriel filed a motion to have Muriel testify in camera, so that the court would understand her stated preferences. Counsel for Cheris M. joined in that motion belatedly. The court, after some consideration, denied the motion. There were three reasons for the denial of the motion. The first reason was that the motion was untimely filed, there having been a date set prior to the trial for the consideration of all motions. The second reason was that the court determined such action not to be in the best interests of Muriel, considering her age and maturity. The third reason was that such direct testimony about her preferences from Muriel was unnecessary and cumulative. Other witnesses, who were permitted to testify to the child's stated preferences, included the DCF social worker, Muriel's guardian, the foster mother, the court-appointed psychologist, as well as Joseph M.
Permitting a child's testimony in court is within the sound discretion of the court. Most often the issue is raised in the context of a custody decision in dissolution of marriage proceedings and Connecticut General Statutes § 46b-54(b), permitting the court to consider the preferences of a child.[12] Even in that context, there is no requirement "that the trial court award custody to whomever the child wished; it requires only that the court take the child's wishes into consideration." Knock. v. Knock 224 Conn. 776, 788, 789,621 A.2d 267 (1993). As it has best been stated in dicta in the case ofGennarini v. Gennarini 2 Conn. App. 132, 137, 138, 477 A.2d 674
(1984), disapproving of the then prevalent practice of private interviews in chambers: CT Page 6165
 "First, whether the child's preferences and feelings as to custody and visitation are a significant factor in the court's ultimate determination of the best interest of the child will necessarily depend on all the facts of the particular case. . . . . Second, even when it is elicited, the information may be of questionable accuracy. A child caught up in the maelstrom of family strife may produce, to the psychologically untrained eye and ear, distorted and thus misleading images not only of the child's parents but of the child's own feelings; and those feelings themselves may be transient. . . . Third, parents learn through long, and sometimes painful, experience with their children that how a child expresses something is often more important than what is expressed." (internal citations omitted and emphasis added).
In the context of termination cases, the court is not explicitly directed to consider the child's expressions of preference, as in a custody or visitation decision. Nonetheless, the connection the child has to her caretakers is one of the factors the court must consider pursuant to Connecticut General Statutes § 17a-112. Muriel's preferences are also an ingredient of the mix of information the court considers in making a determination as to what may be in Muriel's best interests. The difficulty of properly assessing Muriel's offered testimony, of questioning her appropriately and of not adding further stress to Muriel, who is very aware of the competing claims to her, are among the reasons for the court's decision to determine hearing her in camera was not in her best interest and to deny the motion to permit this seven-year-old to testify.
The testimony regarding Muriel's stated preferences comes from numerous sources. Ms. Kolpinski stated that Muriel had in the past expressed her desire to live with her mother and Joseph M. In the more recent past in July of 1997, Muriel stated to Ms. Koplinski that she would like her mother and father to live with her and her foster parents and her foster mother could take care of them, too. She also expressed this same sentiment to her foster mother, who testified to the child's statements. The foster mother testified that in the fall of 1997, Muriel stated that she "would like her parents to live with her foster family where they could get over their problems and Mommy her sickness." When asked about her opinion on where she would like to live in March for 1998 by Dr. Berkowitz, the child responded "that's a judge question" and did not verbalize more. Dr. Berkowitz notes that "this subject is a source of considerable stress for the CT Page 6166 child, and she has significant confusion about her wants, thoughts, and feelings." When questioned, Dr. Berkowitz stated that certainly the child is capable of formulating a preference. She stated that "Muriel is upset about where she is going to live and this makes her very anxious." She stated she believed the psychologist treating her, who is trusted by her, could determine her true preference, something that the child really desired. She seemed puzzled by the focus on this seven year old's preferences. She stated, "it is like asking the child whether she wants peas or ice cream for lunch. The answer of"ice cream" is not in her best interests."
Muriel's guardian-ad-litem testified that the child experienced stress concerning this subject. He stated that in the past her goal had been to get back with Mommy and Daddy. Then, as noted, she wanted Daddy to move in with her foster parents. Most recently, she stated she wanted to live with Joe in his home. When asked why she wanted to live with her Daddy, he testified that "Muriel said she wants to make a decision and that she thought it was important to make a decision and that she loved Mr. M." In closing, Muriel's attorney argued forcefully that living with Joseph M., her daddy, was her expressed desire. Joseph M. also testified that Muriel had repeatedly told him she wishes to live with him.
C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e):
1) Appropriate and timely services were offered by the Department of Children and Families for Cheris and Joe, including individual and group counseling, inpatient and outpatient treatment referrals, hospitalizations and other treatment programs, parenting education, visitation and housing assistance. As noted, Cheris has never been able to remain drug free for any length of time and has made little progress in dealing with her psychiatric problems as well. Joseph, in general, can be said to have attended most of the programs required of him, but greater insight and understanding have not been demonstrated to any substantial degree.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far CT Page 6167 as possible. Visitation with Cheris never progressed beyond being supervised, as she was not reliably able to safely interact with the child. Visitation with Joseph was regular and he attended without fail. DCF's attempts to reunify Muriel with him have failed because of his lack of insight into her emotional and psychological needs and his inability to shield her from the negative impact of her mother's behavior.
3) The Department entered into reasonable and realistic court expectations in order to reunify the family. Those expectations set for both Cheris and Joseph were reasonable and realistic. As noted, Joseph has complied with most of them in the sense of attending programs requested of him. Cheris has remained unable to comply.
4) Muriel exhibits emotional ties with Joseph M., a parentified and concerned connection to her mother and close ties to her foster family.
5) Finding regarding the age of the child. Muriel is seven years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return her to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. Cheris has not reliably maintained contact with Muriel, nor visited regularly. She has been unable to adjust her circumstances so that the court could conclude that it is in the child's best interests that Muriel be returned to her. She does not seek to have the child returned to her at this time. In this case, while many witnesses have testified to the close relationship between Muriel and Joseph, the court-appointed evaluator, Dr. Berkowitz, testified to serious concerns about the Joseph's ability to emotionally and psychologically parent Muriel. Such concerns cannot be discounted. He has not, even though he is not the biological parent, managed to adjust his circumstances so that the court could conclude the return of Muriel to him was in her best interest, nor, given all the time that has elapsed, is such a change likely in the near future. CT Page 6168
7) Finding regarding the prevention of the parents from having a meaningful relationship, etc. The court finds that DCF has taken many steps to encourage Cheris and Joseph to have a meaningful relationship with Muriel. No unreasonable conduct is noted.
D. THE BEST INTERESTS OF THE CHILD
This case turns on what is in Muriel's best interests at the present time, the last day of trial on April 16, 1998. Cheris M., her mother, knows she cannot have the child returned to her at the present time and does not seek her return. Muriel has no other biological parent. But Joseph M., found to be her psychological father, cares for her and loves her. He wants very much for her to be returned to him and to care for her in the future. The court notes that he is a decent man who has struggled to maintain his contact with Muriel and visited with her whenever possible. The court does not doubt his belief that he can provide for Muriel and his promises that he can now protect her from her mother, Cheris M., are sincere and heartfelt. Unfortunately, his past record of being able to adequately provide for Muriel psychologically and emotionally has been deficient. Dr. Berkowitz, saw very little progress on his part in March of 1998. And the court cannot ignore the fact that past behavior is indeed the best predictor of future conduct.
Muriel has flourished in the care of her foster parents. She has, in her own way, provided a clue to the best of all possible worlds, as she sees it. Her conflicting and divided loyalties are poignantly illustrated by her desire to have her mother and father cared for by her foster parents, as she is cared for there as well. A permanent placement, so that she can put down her own interpersonal roots, grow and continue to flourish, is required for her well being. The court concludes that it is in Muriel's best interests that her mother's rights to her be terminated and that she be freed for adoption. The court further concludes that Joseph M. is unfortunately not able to care for Muriel.
E. DISPOSITION
Muriel has been in foster care since April of 1996. It is time for the legal uncertainty concerning the child to end. She continues to show signs of the neglect by her mother. Her improvement since her second foster home placement is compelling CT Page 6169 evidence of her innate resilience and capacity for recovery. As Dr. Berkowitz testified, Muriel's recovery is ongoing and she requires both permanency and a nurturing home. Based upon the foregoing findings, the court determines that it is in Muriel's best interests that her mother's rights to her be terminated. Accordingly, a termination of the parental rights of Cheris M. is ordered. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for Muriel for the purpose of securing an adoptive family and a permanent placement for her. If her present foster family continues to be willing to adopt her, the court directs that they receive first consideration. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Barbara M Quinn, Judge Child Protection Session
[2] Mother has used several names during the involvement of DCF with the family; she is currently known as Cheris M.
[3] Petitioner's Exhibit 4, dated February 13. 1998.
[4] Study for extension of Commitment, June 13, 1997, Petitioner's Exhibit 15, Report of Dr. Berkowitz dated May 23, 1996, Petitioner's Exhibit 3.
[5] While Cheris M. now uses Joseph M.'s last name, they have never been married to each other.
[6] Petitioner's Exhibit 4.
[7] Petitioner's Exhibit 9, a three page listing of the services provided in the last three years, details the full panoply of services provided.
[8] Evaluation dated March 23, 1998, Petitioner's Exhibit 14.
[9] Petitioner's Exhibit 14.
[10] List of services provided, Petitioner's Exhibit 8.
CT Page 6170
[11] Expectations dated August 6, 1996, Petitioner's Exhibit 6.
[12] § 46b-54(b) In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interest of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference,. . . ."